IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Brookewood Construction Co., Inc.,

       Plaintiff,                          Case No. 2:23-cv-295
                                                Judge James L. Graham
    v.                                            Magistrate Judge Chelsey M. Vascura

City of Gahanna, Ohio.,

       Defendant.

Opinion and Order

     Plaintiff Brookewood Construction Co., Inc. brings this suit under 42 U.S.C. § 1983 against defendant City of Gahanna, Ohio. Brookewood alleges that it received the City's approval of a final development plan to build a residential community, but the City later demanded that Brookewood make improvements to its design for the sanitary sewer system. Meeting the City's demands would have substantially increased costs, and Brookewood abandoned the development plans after it completed the first phase of the community. The complaint asserts claims under the Takings Clause of the Fifth Amendment to the United States Constitution and under the Equal Protection and Due Process Clauses of the Fourteenth Amendment, in addition to asserting various state law claims.

     This matter is before the Court on the City's converted motion for summary judgment, which argues that the claims are barred by the statute of limitations. For the reasons stated below, the Court agrees that the claims are time-barred and thus grants summary judgment to the City.

**I.    Background**

       **A.    Factual Allegations**

     In May 2017, Brookewood entered into a land purchase contract for the rights to a 7.2 acre tract of land in Gahanna. Brookewood intended to subdivide and develop the land into a residential community called Pinnacle Pointe. The development would occur in three phases. Once Brookewood found buyers and received deposits for each of the 37 lots (comprising 0.6 acres) to be developed in Phase 1, it could acquire title to that portion of the land. Brookewood had the right to acquire title to the remaining 6.6 acres in a "Second Takedown," by which Brookewood would be required to deliver a monetary deposit by a certain date.

1

On April 20, 2018, Brookewood submitted its Final Development Plan for Pinnacle Pointe. The City's Planning Commission approved the Plan on July 11, 2018. The Plan included the location and placement of the sanitary sewer lines and depicted the direction of flow and the intended outlet location. Construction of Phase 1 began in July 2019, with the placement of sanitary sewer lines in accord with the Plan.

The City first advised Brookewood in May 2018 of its position that the "sanitary sewer, lift station, etc. must be constructed to public standards, and as directed by the Engineer's Office." Compl., ¶ 126. The City further noted that "the system shall be designed to accommodate all offsite tributary areas." *Id.*

At some point in time before January 2020, the City told Brookewood that Phases 2 and 3 would require the construction of a lift station (used to move wastewater from lower to higher elevation) built to public specification standards instead of less expensive private standards. It was Brookewood's expectation that the City would share the cost of construction because the benefit of the station would normally extend beyond the residents of Pinnacle Pointe to "offsite" areas. *See id.*, ¶¶ 29, 31, 132. However, the City indicated that Brookewood would have to build the lift station solely at its expense.

In January 2020, Brookewood met with City Engineer John Moorehead to discuss the lift station. Moorehead stated that no offsite area would be served by the lift station. Brookewood alleges that Moorehead's statement led it to temporarily believe that it would only be required to build the station to private standards. *See id.*, ¶ 33. But Moorehead and the City thereafter "remained steadfast" that Brookewood would have to build the station to public standards. *See id.*, ¶¶ 34, 133.

Brookewood's plan for Pinnacle Pointe's sewer lines also came into dispute. On May 29, 2020, Brookewood received an email from Moorehead. The City stated that the planned sewer outlet lacked sufficient capacity to serve Phases 2 and 3. The City also stated that Brookewood would have to alter the sewer flow. As described by Brookewood, the email indicated that the City had made a "decision to deny use of the planned sewer line depicted in the Final Development Plan." *Id.*, ¶ 50. The required redesign and rerouting of sewer lines would be at Brookewood's expense.

Brookewood believed that the City's position on the lift station and sewer lines was unreasonable and unfair, in that it would require Brookewood to pay for improvements that

2

benefitted the public and not just Pinnacle Point. *See id.*, ¶ 42. The costs to Brookewood of complying with the City's demands would have been prohibitive.

After the May 29, 2020 email, Brookewood made an attempt to investigate the validity of the City's assertion that the planned sewer lines lacked sufficient capacity. Brookewood did this even though Moorehead told Brookewood that the City would not change its decision about requiring it to upgrade the system. *See id.*, ¶ 50. Brookewood requested studies and information from the City regarding the lines and capacity of the area's sewer system. According to Brookewood, the City failed to provide a 2014 Sanitary Sewer Evaluation Survey commissioned by the City. At some unspecified point, Brookewood obtained the study and, based upon information contained therein, prepared its own capacity analysis in October 2021 showing that the capacity of its original sewer design was sufficient. *See id.*, ¶¶ 66–67. The City refused to accept Brookewood's capacity analysis.

In February 2022, Brookewood was in breach of the land purchase contract regarding the Second Takedown for Phases 2 and 3. In March 2022, the land owner listed the remaining 6.6 acres for resale.

**B.      Procedural History**

Brookewood filed this lawsuit on January 20, 2023. The complaint asserts a claim under the Takings Clause, alleging that the City's requirements – that Brookewood build a lift station to public standards and redesign the sewer lines to greater capacity and a different flow direction – deprived Brookewood of an economically viable use of the property. The complaint also asserts an equal protection claim. The City allegedly treated Brookewood, as a developer, differently from ordinary property owners by demanding that it pay for sewer system improvements which would benefit the public at large. The final federal claim is for violations of substantive due process. The complaint alleges that the City's attempts to require Brookewood to pay for public improvements to the sewer system was arbitrary and capricious. The complaint also asserts state law claims for fraud, tortious interference with a contract, and a violation of the Ohio Constitution in the City's attempt to impose allegedly unfair fees on sanitary sewer service.

The City moved for judgment on the pleadings. *See* Fed. R. Civ. P. 12(c). It argued that the claims are barred by the two-year statute of limitations applicable to § 1983 suits in Ohio. The City contended that, accepting the complaint's allegations as true, Brookewood knew no later than May 29, 2020 of the City's position that the lift station would have to be built to public standards and that Brookewood would have to redesign and improve the sanitary sewer lines at its own expense. *See* Compl., ¶¶ 30–36, 39–47, 131, 133. Brookewood filed suit on January 20, 2023, over two years later.

3

Brookewood responded that the statute of limitations should be tolled because of the City's requests that Brookewood forego litigation while the parties attempted to resolve their dispute. Brookewood argued that the parties' settlement efforts continued until April 12, 2022, when the City ended any further discussions.

The Court found that the statute of limitations issue could not be resolved on the pleadings. The parties were allowed to conduct "discovery directed to the issue of whether an equitable tolling or estoppel doctrine should apply to the statute of limitations." Doc. 25 at PAGEID 357. The Court also stated that it would convert the motion for judgment on the pleadings into a motion for summary judgment, *see* Fed. R. Civ. P. 12(d), and instructed the parties to file supplemental briefs after the close of discovery.

The parties have conducted discovery and submitted supplemental briefs, and this matter is now ripe for the Court's consideration.

II.     **Standard of Review**

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

4

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

**III. Discussion**

    **A. The Two-Year Statute of Limitations Period Began on May 29, 2020**

An action under 42 U.S.C. § 1983 is governed by Ohio's two-year statute of limitations applicable to personal injury claims. *See Browning v. Pendleton*, 869 F.2d 989, 992 (6th Cir. 1989); *see also Ewing v. O'Brien*, 115 Fed. App'x 780, 783 (6th Cir. 2004) ("Section 1983 claims brought in federal court in Ohio are subject to the two-year statute of limitations period set forth in Ohio Rev. Code § 2305.11."). The statute of limitations for a § 1983 claim accrues when the plaintiff knew or should have known of the injury which forms the basis of the claim. *Ruff v. Runyon*, 258 F.3d 498, 500 (6th Cir. 2001).

The complaint asserts claims for violations of Brookewood's rights under the Takings Clause and under the Equal Protection and Due Process Clauses. The alleged injury is the same for each claim – that the City would not allow Brookewood to proceed to Phases 2 and 3 of development unless Brookewood, at its expense, would build a lift station to public standards and would redesign and construct the sewer lines, to the benefit of the public.

As noted above, the City argued in its original motion that the complaint's allegations supported a conclusion that Brookewood knew no later than May 29, 2020 of the City's positions about the lift station and sewer lines. Discovery has not led the parties to submit any evidence which would alter May 29, 2020 as being the accrual date for Brookewood's causes of action. The complaint's allegations – including those concerning Engineer Moorehead's meeting with Brookewood in January 2020 about the lift station, his subsequent communications, and his May 29,

5

2020 email – all point to Brookewood knowing by no later than May 29, 2020 of the City's refusal to allow Brookewood to proceed to Phases 2 and 3 of the development plan unless Brookewood met the City's allegedly unlawful demands.

Brookewood did not file suit until January 20, 2023. Thus, absent the statute of limitations being tolled, the § 1983 claims are time barred.

### B. Brookewood Relies on an Equitable Estoppel Argument

The concept of the tolling of a statute of limitations encompasses two separate principles: equitable tolling and equitable estoppel. Equitable tolling refers to the suspension of the limitations period while a plaintiff is justifiably unaware of his claim. *See Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 421–22 (6th Cir. 2009). In other words, the facts underlying the cause of action are concealed from plaintiff, though he has exercised due diligence in trying to discover the cause of action. *See id.* (discussing equitable tolling in the context of fraudulent concealment by the defendant). In contrast, equitable estoppel "applies when plaintiffs are aware of their claims but defendants' conduct prevents plaintiffs from timely filing suit. When this occurs, defendants are estopped from asserting the statute of limitations as a bar to plaintiffs' lawsuit." *Id.* at 424. *See also Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 49–50 (2d Cir. 1985) ("Unlike equitable tolling, which is invoked in cases where the plaintiff is ignorant of his cause of action because of the defendant's fraudulent concealment, equitable estoppel is invoked in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay in bringing his lawsuit.").

The Court's prior order (instructing the parties to conduct discovery and submit supplemental briefs) noted that Brookewood appeared to be relying on an equitable estoppel argument in its brief in opposition to the motion for judgment on the pleadings. *See* Doc. 25 at PAGEID 356. That is, the complaint and Brookewood's brief indicated that it was aware of its causes of action well within the limitations period and was claiming the City made statements during settlement negotiations which caused Brookewood to not file suit by May 29, 2022. Again, the complaint alleges that from January to May 29, 2020, the City notified Brookewood of its denial of Brookewood's sanitary sewer plan for Phases 2 and 3 and of its demand that Brookewood build the lift station built to public standards and redesign the sewer lines.

The supplemental materials submitted after discovery confirm that Brookewood had knowledge of the facts underpinning its causes of action and understood its potential claims against the City well in advance of the end of the two-year limitations period. According to Kevin Dunn,

Brookewood's legal counsel, on March 5, 2021 he began communicating with John Albers, legal counsel for the City, about the "development project and sewer dispute" which forms the basis of the lawsuit. Dunn Aff., ¶ 4.  On September 7, 2021, Mr. Dunn emailed Mr. Albers and stated that Brookewood was prepared to pursue litigation against the City.  Doc. 27 at PAGEID 405.  In a December 9, 2021 email, Mr. Dunn notified Mr. Albers that Brookewood was preparing to file a complaint "asserting a 1983 action" in federal court"  *Id.* at PAGEID 411.  The court thus finds that Brookewood was aware of its claims within the limitations period and that its argument for tolling should be analyzed under the doctrine of equitable estoppel.

### C. The Facts Relating to Equitable Estoppel

Brookewood argues that the City should be estopped from asserting a statute of limitations defense because the City requested that Brookewood not file suit while the parties attempted to negotiate a resolution to their dispute.  The parties began discussions in March 2021 and ended them in April 2022.  *See* Dunn Aff., ¶¶ 4, 5.  Three issues concerned Brookewood during the discussions.  One was "the actual capacity [of] the sewer lines already servicing Phase 1."  *Id.*, ¶ 6.  Brookewood viewed with skepticism the City's claim that there was a history of sewage backups in the area and that Brookewood's plan for Phases 2 and 3 lacked sufficient capacity.  A second concern was the applicability of "public standards for lift station construction."  *Id.*, ¶ 7.  When the City did not relent on its stance about the lift station and sewer upgrades, a third issue became the possibility that the City would share the cost for those improvements.  *Id.*, ¶ 18.

According to Mr. Dunn, the parties did not make much progress in the summer of 2021 because of the City's delays in making its engineering staff available to meet with Brookewood.  *Id.*, ¶¶ 7, 8.  Brookewood grew "frustrated" with the delays.  *Id.*, ¶ 9.  Mr. Dunn states that he expressed to Mr. Albers that "time was of the essence in resolving the dispute between the parties."  *Id.*, ¶ 11. According to Mr. Dunn, Mr. Albers communicated that Brookewood should not file suit and that "efforts would be made to find an alternative resolution."  *Id.*, ¶ 12.  Mr. Dunn believed that the parties had an "agreement" to try to resolve the matter.  *Id.*, ¶¶ 14, 15.  But after more delays, Mr. Dunn emailed Mr. Albers on September 7, 2021 and claimed that the City's agreement to negotiate was nothing but a "delay tactic" and that Brookewood "must pursue litigation if Gahanna is not interested in problem solving." Doc. 27 at PAGEID 405.

Brookewood obtained the City's 2014 Sanitary Sewer Evaluation Survey ("SSES") and hired an engineering firm to provide an updated hydraulic capacity analysis in light of the plans for Phases 2 and 3.  *See* Compl., ¶ 66; Doc. 27 at PAGEID 411.  The result was an October 2021 report which,

7

in Brookewood's eyes, showed that the originally-planned sewer design had sufficient capacity and that the development of Phases 2 and 3 would not "have any adverse sanitary sewer capacity effects on the existing collection system." Doc. 1-6 at PAGEID 245.

On December 9, 2021, Mr. Dunn emailed Mr. Albers and made reference to the October 2021 study in asserting that "there is plenty of capacity available" in the sewer lines "for all phases of Pinnacle Pointe Development." Doc. 27 at PAGEID 411. Mr. Dunn advised that he was preparing to file a § 1983 suit in federal court in light of the City's apparent rejection of the study. Mr. Dunn emphasized that the "continued delay will result in serious financial repercussions for my clients. . . . [W]e are days away from filing our Complaint." *Id.* He added that Brookewood "would still prefer to resolve the matter without the need for litigation" and would hold off filing suit if the City "is ready to work together to resolve the dispute." *Id.*

After the December 9 email, Mr. Albers told Mr. Dunn that "the City desired Brookewood not to file [suit] and was willing to consider a cost sharing resolution." Dunn Aff., ¶ 19. On January 6, 2022, Mr. Albers advised Mr. Dunn that the City was retaining an engineering firm to conduct a pump station analysis and cost study. *See* Doc. 27 at PAGIED 414. The study was completed and provided to Brookewood on March 9, 2022. Dunn Aff., ¶ 25.

Also on March 9, 2022, Mr. Albers emailed Mr. Dunn to say that the City was "willing to consider participating in the cost" of the sewer improvements. Dunn Aff., ¶ 27. Mr. Albers stated that a tax increment financing (TIF) option was "under review" by the City but that there was no time table for a decision. *Id.*

It was during this same time period of February and March of 2022 that Brookewood failed to meet the requirements of the Second Takedown and the land owner terminated the purchase contract. Compl., ¶ 75.

The City received a copy of a letter which Brookewood sent to potential buyers who had placed deposits on homes to be built in Phases 2 and 3. The letter informed them that the project was not going forward and that Brookewood would be returning their deposits. *See* Doc. 27 at PAGEID 433.

Mr. Albers emailed Mr. Dunn on April 12, 2022 to state that the City was aware of the letter which Brookewood had sent to the potential buyers. *Id.* The City also learned that the property owner had relisted the land for sale. *Id.* Based on this information, "we [the City] have discontinued our efforts to review and determine whether the City will potentially subsidize or TIF that project to achieve services to the remainder of the Pinnacle Point property." *Id.*

8

In Mr. Dunn's view, the conduct of Mr. Albers on the whole from March 2021 to April 2022 led him to believe that "the City intended to negotiate an alternative resolution to the sewer dispute." Dunn Aff., ¶ 33. Mr. Dunn characterized the discussions in late 2021 and early 2022 as the City changing its position about Brookewood solely bearing the cost. Dunn Dep. at 23–24. With the City being willing to consider cost sharing, Mr. Dunn believed the parties would get the matter settled. *Id.* at 24. From Brookewood's perspective at the time, there was no need to file suit if the City would agree to share the cost of the sewer upgrades. *Id.* at 27.

The parties of course did not reach a settlement. *Id.* at 33–34. Negotiations did not progress to the point where the City set forth a proposed cost sharing structure with percentages of how much each side would finance, nor did the City ever approve any cost sharing arrangement. *Id.* at 31–32; *see also* Doc. 27 at PAGEID 433 (Mr. Albers's April 12, 2022 email reflecting that the City had been in the midst of reviewing the potential of cost sharing when it learned that Brookewood had called off Phases 2 and 3).

During discovery the City took the deposition of Mr. Dunn. Mr. Dunn testified that the parties had "ongoing settlement negotiations" from March 2021 to April 2022. Dunn Dep. at 7. The parties never entered into a tolling agreement. *Id.* at 10–11, 15; *see also id.* at 14, 34 (testifying the Brookewood did not request a tolling agreement). Mr. Albers requested in the summer of 2021 and again in late 2021 that Brookewood not file suit while the parties were working toward a resolution. *Id.* at 14–15. Mr. Albers did not promise that the City would refrain from raising the statute of limitations as a defense. *Id.* at 11. Nor did Mr. Albers state that the City would stop negotiating if Brookewood filed suit. *Id.* at 13, 19–20, 35, 40. Mr. Dunn admitted that "there was nothing prohibiting [Brookewood] from filing the complaint" at any time from March 2021 to April 2022. *Id.* at 12; *see also id.* at 18–19, 34. Though Mr. Albers requested that Brookewood not file suit, "there was no consequence attached" if Brookewood were to proceed with litigation. *Id.* at 36.

When negotiations broke off in March and April of 2022, Mr. Dunn waited to file suit while Brookewood was "assessing what was going on" and was trying to "salvage the purchase contract" with the land owner. *Id.* at 30–31.

**D. Analysis**

Equitable estoppel "is invoked in cases where the defendant takes active steps to prevent the plaintiff from suing in time." *Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 891 (6th Cir. 2004); *see also Egerer*, 556 F.3d at 425 (holding that equitable estoppel requires "affirmative steps or action on the part of a defendant" which reasonable keeps plaintiff from timely filing suit). The

9

doctrine has been invoked "in cases where the defendant misrepresented the length of the limitations period or in some way lulled the plaintiff into believing that it was not necessary for him to commence litigation." *Cerbone*, 768 F.2d at 50 (citing cases). "Application of equitable estoppel should be premised on a defendant's improper conduct as well as a plaintiff's actual and reasonable reliance thereon." *Bridgeport*, 371 F.3d at 891 (internal quotation marks omitted). The party seeking the benefit of equitable estoppel bears the burden of proof. *See id.*, 371 F.3d at 891 n.6.

Promises and representations made during settlement negotiations can form the basis of equitable estoppel. *See Bridgeport*, 371 F.3d at 891; *Cerbone*, 768 F.2d at 50 ("One factor that frequently appears in the estoppel cases is a settlement negotiation."). Courts examine a defendant's conduct to determine if it caused reasonable and detrimental reliance by the plaintiff – whether by way of a misrepresentation, trick, promise, or assurance. *See, e.g., Bridgeport*, 371 F.3d at 891; *Egerer*, 556 F.3d at 425; *Cerbone*, 768 F.2d at 50; *JRC Holdings, Inc. v. Samsel Servs. Co.*, 166 Ohio App. 3d 328, 336, 850 N.E.2d 773, 779 (Ohio Ct. App. 2006).

A defendant's mere willingness to engage in negotiations is not enough to justify equitable estoppel. *Helm v. Eells*, 642 Fed. App'x 558, 564 (6th Cir. 2016); *see also Mercado v. Aviation Assocs., Inc.*, 974 F.2d 1329 (1st Cir. 1992) ("[N]egotiations do not toll the running of a limitations period."); *Calautti v. Massachusetts Port Auth.*, No. 22-CV-10930-ADB, 2022 WL 10480172, at *3 (D. Mass. Oct. 18, 2022) ("Mere negotiations are insufficient to gain the benefit of the equitable estoppel doctrine.") (internal quotation marks omitted). Plaintiff must show inequitable conduct by defendant that prevented plaintiff from filing suit. Such conduct can include deceit about the length of the limitations period, a promise not to assert the statute of limitations as a defense, a representation that the defendant will in fact settle or otherwise make the plaintiff whole, or an assurance of a better settlement if plaintiff refrains from filing suit. *See, e.g., Bridgeport*, 371 F.3d at 891; *Cerbone*, 768 F.2d at 50; *Calautti*, 2022 WL 10480172, at *3; *Gieringer v. Silverman*, 539 F. Supp. 498, 503 (E.D. Wis. 1982), *aff'd*, 731 F.2d 1272 (7th Cir. 1984); *JRC Holdings*, 166 Ohio App. 3d at 336, 850 N.E.2d at 779.

Discovery has eliminated much of the potential grounds for equitable estoppel. There is no evidence to suggest that the City deceived Brookewood about the statute of limitations. The City did not consent to a tolling agreement, nor did it promise not to raise the statute of limitations as a defense. It did not threaten to cease negotiations if Brookewood filed suit. The City did not assure Brookewood that it would settle the matter or that it would offer a better deal if Brookewood refrained from filing suit. Though Brookewood argues that Mr. Albers and Mr. Dunn had an

10

"agreement," discovery has demonstrated that their agreement was not one to settle the case but rather one to engage in negotiations. Dunn Aff., ¶ 15. Again, a mere willingness to negotiate does not trigger equitable estoppel. *Helm*, 642 Fed. App'x at 564.

Brookewood's argument for estoppel largely boils down to the assertion that Mr. Albers, on behalf of the City, requested that Brookewood not file suit while the parties negotiated. Such a request could potentially warrant equitable estoppel if accompanied by unfair conduct by defendant and reasonable reliance to plaintiff's detriment. *See Williams v. Sims*, 390 F.3d 958, 960 (7th Cir. 2004); *Cerbone*, 768 F.2d at 50. Brookewood has not satisfied either requirement.

Brookewood has not shown that the City made promises that it did not intend to keep. The City asked Brookewood not to file suit while the parties negotiated. The record makes clear that the City did in fact negotiate with Brookewood and they made progress on a cost-sharing resolution, even if the pace of negotiations was not as swift as Brookewood would have preferred. *See Luar Music Corp. v. Universal Music Grp., Inc.*, 847 F. Supp. 2d 299, 314 (D.P.R. 2012) ("[A] listless attitude toward settlement negotiations does not rise to the level of affirmative misconduct required to establish equitable estoppel."). The City's request that Brookewood not file suit did not carry with it any promises, demands, or threats. Mr. Dunn testified that "there was no consequence attached" to Mr. Albers's request if Brookewood were to proceed with filing suit. Dunn Dep. at 36. He added that there was "nothing prohibiting" Brookewood from filing suit while the parties negotiated. *Id.* at 12.

Brookewood argues that the City delayed negotiations by acting deceptively and in obstructionist fashion when it failed to produce the 2014 SSES study after Brookewood asked for documents relevant to the City's position that Brookewood's sewer design lacked sufficient capacity. It is unclear exactly when Brookewood asked for documents, but it was likely no later than the summer of 2021. *See* Doc. 27 at PAGEID 405 (September 7, 2021 email referencing that Brookewood had previously made a request for records). According to Brookewood, the City withheld the SSES because it was unfavorable to the City's position.

On the record before it, the Court cannot make a determination that the City's alleged failure to produce the SSES was improper. Brookewood has not shown that the City had a duty to produce the records or that it made a knowing misrepresentation about the study. Mr. Dunn's affidavit repeats the Complaint's legal assertions that the City made misrepresentations, but Brookewood has failed to provide the Court with information which would establish the particulars

11

of the alleged misrepresentations, such as what the City said, who said it, when it was said, to whom was it said, and how it was false.

As importantly, even if the City was not forthcoming about the SSES, Brookewood cannot establish detrimental reliance that caused it to miss the deadline to file suit. Despite not initially having the SSES, Brookewood never accepted the City's position about the insufficiency of Brookewood's original design, and its communication with the City was correspondingly adversarial. *See* Doc. 27 at PAGEID (email from Mr. Dunn to Mr. Albers accusing the City of being obstructionist, engaging in delay tactics, and being unwilling to accept certain facts). Brookewood was not lulled into ignoring or not considering litigation as an option. Instead, it expressly threatened to "pursue litigation" as it stated its displeasure with the City's refusal to budge on its stance about the need for sewer system upgrades. *Id.*

Moreover, Brookewood soon obtained the SSES in any event[1] – in time to retain an engineering firm which prepared an October 2021 hydraulic capacity analysis "based upon the SSES." Compl., ¶ 66; *see also* Doc. 1-6, Doc. 27 at PAGEID 411. Rather than being tricked or lulled by the City, Brookewood pushed back and asserted that that its analysis showed there was "plenty of capacity available" with Brookewood's design for Phases 2 and 3. Doc. 27 at PAGEID 411. When the City refused to accept Brookewood's analysis, Brookewood warned in December 2021 that it was "days away from filing" a lawsuit. *Id.* All of this transpired five to seven months prior to the running of the statute of limitations in May 2022. Brookewood has not shown how the City's failure to produce the SSES prevented it from timely filing suit. *See* Dunn Dep. at 45 ("Q. But regardless of whether there were delays on the City's part, that did not prevent you from filing the lawsuit, right? A. It did not.").

Brookewood also argues that in late 2021 the City "changed its position" on cost sharing. Doc. 27 at PAGEID 365. The City had previously insisted that Brookewood fully pay for the sewer upgrades but in December 2021 signaled that it was willing to consider cost sharing options. According to Brookewood, the City led it to believe that there was no need to consider litigation because the City would be offering a cost-sharing arrangement. With Mr. Albers requesting that Brookewood not file suit and with the City now interested in cost sharing, Mr. Dunn claims he saw no reason to file suit in late 2021 and early 2022.

Here too Brookewood has failed to show improper conduct by the City and reasonable reliance on Brookewood's part. Mr. Albers did not promise that the City would in fact settle or

---

[1] The record does not make clear how Brookewood obtained the SSES.

12

enter into a cost-sharing agreement. In late December 2021, he told Mr. Dunn that the City was engaging an engineering firm to conduct an analysis of the sewer upgrades. *See* Doc. 27 at PAGEDID 423. On January 6, 2022, Mr. Albers emailed Mr. Dunn to say that the City had authorized the firm to proceed with the analysis. *Id.* at PAGEID 414. Mr. Albers relayed to Mr. Dunn that the firm had said the analysis would take 4 weeks to complete. *Id.* at PAGEID 423. Though it apparently took longer, Mr. Albers spoke truthfully in stating that the firm had said it would take 4 weeks. *Id.* at PAGEID 417 (proposal letter from the firm setting a time schedule of 4 weeks once the analysis got started). After the January 6 email, Mr. Albers truthfully updated Mr. Dunn to inform him of delays with the firm completing its analysis. Dunn Dep. at 32. The analysis was completed on March 9, 2022, and Mr. Albers told Mr. Dunn that the City was "willing to consider participating in the cost" of the sewer improvements and had "begun the process of reviewing" a TIF option, but "I don't yet have a time table for a decision." Dunn Aff., ¶ 27.

Though the progress might have made Brookewood hopeful, the City did not mislead Brookewood about its intentions. *See Luar*, 847 F. Supp. 2d at 314 (finding that defendant's emails demonstrating a "hope and desire to settle the controversy" did not suffice to invoke equitable estoppel). Mr. Albers's communications did not contain assurances about the timing or exact nature of a cost-sharing arrangement. As such, it would not have been reasonable for Mr. Dunn to detrimentally rely on them. Mr. Dunn acknowledged "the process" which remained until a final resolution could have been reached, including agreement on the "cost sharing structure" and "percentage breakdown" of the parties' financial responsibilities, the taking of "proposals and bids," and a formal vote and approval from the City. Dunn Dep. at 31, 32, 34.

Without question, Mr. Dunn was in a predicament. Negotiations with the City had progressed, but uncertainty loomed over the timing, how much of the cost the City would be willing to absorb, and whether the parties ultimately could reach a resolution. In this same time frame, the requirements for the Second Takedown came due. Brookewood did not satisfy the requirements and the land owner put the property up for sale. Though unfortunate for Brookewood, there is no evidence to show that the City engaged in inequitable conduct or took "active steps to prevent the plaintiff from suing in time." *Bridgeport*, 371 F.3d at 891.

Even if Brookewood were somehow justifiably lulled for a time by the hope of a settlement with the City, its hope ended with ample time left for it to timely file suit. Not only did the land owner relist the property for sale in March 2022 and Brookewood refund deposits to potential buyers, but on April 12, 2022, the City told Brookewood that it had "discontinued" it efforts to

13

review cost-sharing options.  Doc. 27 at PAGEID 433.  In order to obtain the benefit of equitable estoppel, a party "must establish due diligence."  *Egerer*, 556 F.3d at 425.  Mr. Dunn knew no later than April 12, 2022 that efforts to negotiate a resolution with the City had ceased.  In December 2021, he had already prepared a complaint to file in federal court.  *See* Doc. 27 at PAGEID 411 (Mr. Dunn stating that he had been preparing a § 1983 complaint and was "days away" from filing it).  Brookewood has not shown good cause for why it failed to timely file suit by May 29, 2022.  *See* Dunn Dep. at 30 (stating that he did not file suit when negotiations ended in April 2022 because Brookewood was "assessing what was going on").

## IV.     Conclusion

Accordingly, the Court finds that the City is not equitably estopped from raising the statute of limitations as a defense.  Because Brookewood did not timely file its § 1983 claims, the City's converted motion for summary judgment (doc. 7) is GRANTED with respect the federal claims.  The Court declines to exercise supplemental jurisdictions over the state law claims, which are dismissed without prejudice.  *See Packard v. Farmers Ins. Co. of Columbus Inc.*, 423 Fed. App'x 580, 584–85 (6th Cir. 2011).

*s/ James L. Graham*
JAMES L. GRAHAM
United States District Judge

DATE: July 15, 2025